IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

*FILED*

AUG 3 1 2012

U.S. DISTRICT COURT
CLARKSBURG, WV 26301

RAMONA L. HOSEY,

      Plaintiff,

v.

           Civil Action No. 1:11CV207
           (The Honorable Irene M. Keeley)

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,

      Defendant.

## REPORT AND RECOMMENDATION/OPINION

This is an action for judicial review of the final decision of the defendant Commissioner of

the Social Security Administration ("Defendant," and sometimes "Commissioner") denying the

Plaintiff's claim for disability insurance benefits ("DIB") under Title II of the Social Security Act.

The matter is awaiting decision on cross motions for summary judgment and has been referred to the

undersigned United States Magistrate Judge for submission of proposed findings of fact and

recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b).

## I. PROCEDURAL HISTORY

Ramona L. Hosey ("Plaintiff) filed an application for DIB on October 2, 2007, [*1] alleging

disability since April 1, 2005, due to arthritis, seizures, asthma, osteoporosis, stomach, acid reflux,

hernia, and depression (R. 232, 237). Plaintiff's applications were denied at the initial and

reconsideration levels (R. 124, 131). Plaintiff requested a hearing, which Administrative Law Judge

Richard Brady ("ALJ") held on June 25, 2009 (R. 42). Plaintiff appeared without a lawyer and

without medical records. The ALJ gave her forms to fill out so he could obtain the medical records,

---

[*1] Plaintiff's date last insured (DLI) is December 31, 2008 (R. 196). She therefore must prove she was disabled on or before that date. Johnson v. Barnhart, 434 F.3d 650 (4th Cir. 2005).

advised her of her right to counsel, and continued the hearing (R. 50-51). ALJ Brady held the continued hearing on November 18, 2009 (R. 52). Plaintiff, represented by counsel, and Vocational Expert ("VE") James Ganoe testified. On January 20, 2010, the ALJ entered a decision finding Plaintiff was not disabled through December 31, 2008, her Date Last Insured (R.16-34). Plaintiff filed a request for review to the Appeals Council, which was denied , making the ALJ's decision the final decision of the Commissioner (R. 1).

## II. FACTS

Plaintiff was born on February 25, 1956, and was 49 on years old on her alleged onset date, and 52 years old on her date last insured (R. 212). She has a high-school education and a secretarial diploma from West Virginia Career College (R. 241). She has past relevant work as salesperson, sewing machine operator, press machine operator, census clerk, test clerk, convenience store clerk, stock clerk, and cashier (R. 92-93).

According to the record, Plaintiff did not work outside the home from 1980 through 1993. She subsequently stated she stayed at home raising her children while her husband worked. Plaintiff had complaints of neck and back pain, headache, low back pain, bilateral shoulder pain, left hip pain, arm and hand numbness, and wrist pain since at least 1990 (age 36) (R. 426).

In September 1992, Plaintiff reported pain in her hand, arms and neck, at times severe. Other times she was just tired and aching with skin numbness, plus numbness and pain at night (R. 424). She experienced headache, difficulty sleeping and ringing in her ears. She expressly did not experience crying spells or depression or loss of memory. Also in 1992, Plaintiff "slammed on her bakes and hit her nose on the steering wheel and fractured it" (R. 423). She subsequently started having lower back pain.

2

Plaintiff was in an automobile accident in 1993, after which she experienced immediate and subsequent pain in her left shoulder area, neck, and back of head (R. 422).

Plaintiff worked in 1994, 1995, 1998, and 1999, although never making more than $3700.00.

Plaintiff was in another automobile accident in 2000, after which she reported neck pain. In 2000, Plaintiff earned over $9,000.00. She did not work in 2001, but worked in 2002, 2003, 2004, and 2005.

Plaintiff had bilateral carpal tunnel surgery in the late '90's or early 2000's. Tests had been negative but the surgeon believed she had it anyway, and performed the surgery.

On May 10, 2004, Plaintiff presented to Dr. Given for a follow up of abdominal pain at a level of 1-2, left leg pain at a level of 3-4, bilateral shoulder pain at a level 4-5, which was "very aggrivating" (sic) (R. 293).

A June 8, 2004 EMG for complaints of numbness, tingling, and twitching in the neck and extremities was normal with no evidence of generalized peripheral neuropathy (R. 317).

On December 16, 2004, Plaintiff presented to Dr. Given with complaints of pain in her legs, numbness in her left leg and left hand, soreness of her left thumb, soreness of her right big toe and left small toe, ringing in her left ear, "nervous twitches" in different parts of her body, "a lot of tension," and sometimes slurred speech (R. 291). She reported her husband was now home 24/7 and she was under stress. She said her hands went numb, her knees hurt a lot, but she did not see Dr. Galey as directed for her knees. She reported "some" low back pain, stating that if she touched her back it was sensitive. She was still smoking and was prescribed Wellbutrin to help her quit.

X-ray of the knees on December 27, 2004, showed "Mild degenerative changes of each knee involving predominately the patellofemoral compartment" (R. 286).

X-ray of the right shoulder on February 23, 2005, showed "Small ossific density noted in the region of the right humeral head. This may be related to a small bone island. Calcification within the tendon cannot be excluded. Further evaluation of this region should be performed with an MRI of the shoulder" (R. 284).

X-ray of the left shoulder on February 23, 2005, was normal (R. 284).

On February 28, 2005, Plaintiff presented to orthopedic surgeon Joseph Snead, M.D., upon referral by Dr. Given, for bilateral knee and shoulder pain (R. 301). She said she had the knee pain for many years, and had had cortisone shots which gave no relief. Her knees "crunched" when she went up and down the stairs. She said she had difficulty getting her arms over her head and behind her back and said she had had shots in her shoulders for bursitis. She complained she could not sleep on her side due to shoulder pain.

On examination, Dr. Snead found full range of motion of both knees, with bilateral patellofemoral crepitation (R. 301). The ligaments were stable and there was no swelling.

Plaintiff's shoulders demonstrated only 90 degrees of abduction on both sides with pain getting her arms behind her back; positive impingement sign.

Dr. Snead reviewed Plaintiff's x-rays, finding they looked normal except for slight calcification other than the supraspinous tendon of the shoulder. He diagnosed chondromalacia of the patella and bursitis of the shoulder. He opined she might benefit from cortisone and xylocaine injections in the shoulder and synvisc in the knees.

On March 11, 2005, Plaintiff presented to Dr. Given with complaints of back pain and not urinating as much as usual (R. 290). She wanted a urinalysis and to be prescribed an antibiotic.

On March 15, 2005, Plaintiff presented to Dr. Given for a check up and complaints of back

4

pain and tenderness of the epigastric area with nausea (R. 290). She described her back pain as "can't stand anything to touch back," and at a level of 6 out of 10. On examination her upper abdomen and right upper quadrant was tender. Her doctor assessed Peptic Ulcer Disease ("PUD"), Gastroesophageal Reflux Disease ("GERD"), and gastritis, and prescribed Prevacid. H-pylori was negative (R. 297).

On March 17, 2005, Dr. Snead reported to Dr. Given that Plaintiff had had both shoulders and both knees treated with shots without relief (R. 435). Other than continuing the shots, he opined there was not much else to do. She was "not quite a candidate for a total knee replacement yet because her condition is not that bad."

Plaintiff's alleged onset date is April 1, 2005.

On April 18, 2005, Plaintiff presented to Dr. Given with complaints of her "neck bothers her, feels like it's swelling, but it's not," and "sinuses bother her" (R. 289). She would only see Dr. Given, who was not immediately available. She waited a while, but then left.

MRI of the left shoulder on May 13, 2005, showed "Mild increased signal intensity in the distal supraspinatus tendon with subchondral cystic changes in the humeral head. Findings are most consistent with chronic tendon degeneration or partial under surface tear. No evidence of full thickness or complete tear" (R. 283).

MRI of the right shoulder on May 13, 2005, showed "Chronic tendon degeneration versus partial under surface tear of the distal supraspinatus tendon. No evidence of full thickness or complete tear. Findings similar to left shoulder. No evidence of acute abnormality or joint effusion" (R. 283).

On May 31, 2005, Plaintiff presented to Dr. Given with complaints of coughing, sweating,

5

headache, and nausea at times (R. 289). She was assessed with infection and prescribed antibiotics.

On June 1, 2005, Dr. Snead reported Plaintiff had ongoing shoulder pain after four shots, and suggested arthroscopic rotator cuff decompression of the right shoulder (R. 300).

On June 22, 2005, Plaintiff presented to Dr. Given's office for a sore throat (R. 288). She was given a strep throat test, which was negative (R. 296).

Also on June 22, 2005, Plaintiff completed a disability report at an SSA field office for her prior application (R. 212). She appeared in person, and the SSA employee with whom she spoke observed no difficulties with hearing, reading, breathing, understanding, coherency, concentrating, talking, answering, sitting, standing, walking, seeing, using hand, or writing. No disability was noted.

On June 29, 2005, Plaintiff presented as a new patient to Darla Piggott, MD (R. 360). She reported a history of low calcium for a couple of years, jerking of hands, and twitching of muscles. She also reported trouble with constipation, ankles swelling if on her feet a lot, arthritis, especially in her knees, history of anxiety attacks and depression, painful sex for two years, can't stand tight bra because uncomfortable due to referred pain from stomach, blurry vision, history of allergies for which she had done shots, lots of stomach trouble, spot on left leg for 3-4 years, history of migraines that have almost stopped, and right shoulder surgery scheduled next month. Plaintiff said she had been on Lipitor but it caused muscle weakness and she couldn't work; and had been on Prozac, but it made her a "zombie." She reported a very poor memory. She just finished Augmentin because of pneumonia, then got thrush from that. She had a prescription for the thrush but couldn't remember to take it.

Plaintiff stated that her husband had a stroke recently and everything was chaotic and

6

stressful. She had been going to leave him before the stroke, but now felt she could not.

Upon examination Plaintiff's weight was 184. She was 5'8" tall. She had a large sore on her left leg and lots of varicose veins. Her speech was scattered and she was easily distracted. Otherwise the examination was normal.

Dr. Piggott diagnosed hypocalcemia, gastritis, depression/anxiety, fatigue, and arthralgias. She prescribed Effexor and Tylenol as needed for pain.

Plaintiff completed a disability report sometime between this first visit with Dr. Piggott on June 29, 2005, and her shoulder surgery on July 19, 2005. She reported her impairments at that time and on that application as "arthritis and breathing problems" (R. 217). Her explanation for her inability to work was: "I can't stand on my feet without my ankles and feet swelling." She stated she stopped working September 30, 2004, because she couldn't lift things anymore. She was seeing her primary care provider, Darla Piggott, for arthritis, and Joseph Snead for shoulder problems, stating he was "going to do surgery on both [her] shoulders."

Dr. Snead performed arthroscopic acromioplasty of the right shoulder on July 19, 2005 (R. 299). Plaintiff tolerated the procedure very well.

Plaintiff followed up with Dr. Piggott on July 22, 2005 (R. 359). She reported the Effexor was doing well, with no side effects. She wanted to try Nexium samples in place of the Prevacid due to "breakthrough symptoms." She reported her recent shoulder surgery. H Pylori was negative. Her cholesterol was 226, and she reported a 60 pound intentional weight loss in the past year, so the doctor delayed starting medication, to see if she could control her high cholesterol with diet. She was diagnosed with depression/anxiety and gastritis.

Plaintiff followed up with Dr. Snead on Jul 28, 2005, reporting a lot of shoulder pain (R.

7

431). He showed her some exercises she could do at home to increase the motion in her shoulder (R. 431).

Plaintiff followed up with Dr. Snead on August 17, 2005, reporting she was doing better (R. 429). She had 160 degrees of abduction. She lost some internal rotation but her pain was much better, so Dr. Snead opined "she is going to be okay."

Plaintiff followed up with Dr. Piggott on September 16, 2005, reporting she was doing much better on Nexium (R. 358). She did not get the EGD. Her shoulder was still sore. She had chest pain which went from an ache to bad pain. She had several episodes that were severe and went into her neck with no radiation to her arm but she was short of breath. Her sister was diagnosed with ovarian cancer and she was concerned she had it, too, because she had some of the same symptoms: abdominal swelling, occasional bleeding, and pain with intercourse. Her legs felt like worms were crawling on them.

Examination was generally normal. Dr. Piggott diagnosed restless leg syndrome, atypical chest pain, gastritis/GERD, and postmenopausal bleeding. The doctor recommended she quit smoking. She was scheduled for CT of the abdomen and pelvis, a nuclear stress test, an EGD, and blood test for ovarian cancer.

On September 22, 2005, Plaintiff had a myocardial perfusion scan and stress test which showed no significant reversible ischemia, and normal systolic function with no obvious significant regional wall motion abnormality. The diagnosis was atypical chest pain with a negative stress test (R. 446).

Plaintiff followed up with Dr. Piggott on October 13, 2005, with complaints that on some nights the Requip wasn't working for her legs. It worked well enough that it was worth taking,

however, and had no side effects. She was "gaining weight like crazy" despite diet changes and exercise. Her stomach seemed bloated. She was doing very well with nexium. Her shoulders were very sore. In the morning she couldn't move, because her shoulders were very stiff. She "can't get enough peanut butter sandwiches." She felt anxious because she liked to be alone at times but was always surrounded by family. The left side of her foot thumps. She had frequent vaginal yeast infections, and painful intercourse.

Examination was normal, except for epigastric tenderness. Plaintiff had good eye contact, was smiling, and interacted appropriately. She was assessed with weight gain, possibly due to Effexor, postmenopausal bleeding for which she was to see a gynecologist, depression and anxiety, for which Plaintiff said she was going to make lifestyle changes, and GERD.

An office note one week later indicated Plaintiff was a "no show" for the gynecology appointment (R. 357).

Plaintiff presented to Dr. Piggott on November 2, 2005, with complaints of "stomach hurting" (R. 356). Nexium was working, but her stomach still swelled up. She also reported that he had been "forgetful" lately, and had black-out spells. She had had them before, but they "went away." She had fallen into the stove "before" and they were "starting again." She had had two spells, in which she feels queasy in the stomach and things "look funny" and then things "go black, like in dark with light in distance." There was not complete loss of consciousness. The spells lasted 5-10 minutes. She was usually alone when they happened. After they were over she was "ok."

Examination was normal. Plaintiff was diagnosed with Irritable Bowel Syndrome ("IBS"), "spells," which the doctor opined may be psychosomatic, and postmenopausal bleeding.

Plaintiff presented to Dr. Piggott for a routine followup on December 5, 2005 (R. 355). She

9

reported having had two more "spells of going black." They lasted about five minutes. She would just sit and try not to move. She had a sharp pain in her head before it happened. She had been at the computer. She also reported her memory was bad, and that she went to her home from ten years ago instead of her new home. She also reported yeast infections. She did go to see the gynecologist, who believed she may have fibroids and scheduled a biopsy.

Examination was normal and Plaintiff was "neurologically intact." She was assessed with "spells," for which she was scheduled for a CT of the head and EEG.

On December 13, 2005, Plaintiff had a CT scan of her head which was unremarkable (R. 441).

On December 14, 2005, Plaintiff had a Sleep EEG which was normal (R. 440).

On December 15, 2005, Plaintiff had an EEG which was normal (R. 442).

Plaintiff presented to neurologist Andrew Stefanick, MD, supervised by John Brick, MD, on referral from her treating physician Dr. Piggott, for her complaints of possible seizures, on January 9, 2006 (R. 312). She reported that for the past five years she had had three types of "episodes"– one where she felt like everything was going to go black, but she did not pass out and felt nauseous afterwards; one where she passed out and hit her head on the stove, lost her bowel function and vomited; and one where she felt lightheaded when she changes position. She reported she was under a lot of stress including having a son that may end up going to Iraq. She denied any history of seizures, but did report a history of migraines, the last one being four to five months ago. Her husband was in a mining accident three years ago "and this still gives her stress."

The only thing found on exam was numbness in her left hand with a positive Tinel sign, and some diplopia with recall.

There was no diagnosis, but the doctor was concerned her episodes could be seizures, and scheduled an EEG and MRI of the brain.

During hospital admission for MRI and EEG January 18-20, 2006, Plaintiff reported a five-year history of blackout spells (R. 323). Plaintiff's husband of 25 years said he had never witnessed an episode (R. 323). Plaintiff said she could go day to weeks without a "spell", but the episodes usually occurred at night and she and her husband slept in separate rooms.

A January 18, 2006, MRI of the brain was "unremarkable" with no abnormal signal, no intracranial mass lesion, abnormal enhancement, or intracranial hemorrhage (R. 316).

A January 18, 2006, EEG was normal (R. 339).

A January 19, 2006, EEG was normal (R. 340).

A January 20, 2006 EEG was "consistent with a structure or functional underlying area of abnormality in the left temporal region which may have epileptiform potential" (R. 341).

Plaintiff was diagnosed with "spells of unclear etiology" (R. 327). She was discharged in stable conditions with no new medications prescribed.

Plaintiff followed up with Dr. Piggott on January 26, 2006, who reported Plaintiff had had "extensive testing" for her "spells" and "nothing showed up." She now complained that "something was in her throat and won't go down." She was also scheduled for a hysterectomy for perforated endometrium. She said she quit smoking one week earlier.

Exam was normal. The doctor was unable to see anything in her throat, and scheduled her for a laryngoscope. She was diagnosed with "foreign object in throat," "spells- most likely seizures," and perforated endometrium.

A February 2, 2006, barium swallow showed the esophagus to be normal, with no evidence

of stricture, hiatal hernia, reflux or reflux esophagitis (R. 310). Plaintiff was scheduled for an EGD.

A February 7, 2006, chest x-ray was normal (R. 506).

On February 8, 2006, Plaintiff had a CT scan of her neck (R. 4870. It showed no mass, except several small lymph nodes with no significant enlargement to suggest adenopathy.

On March 15, 2006, Plaintiff presented to Dr. Piggott with complaints of coughing (R. 353). She had the hysterectomy postponed due to the cough. Acid from her stomach was irritating her throat. She took Nexium and Zantac and "lots of Tums." She still felt acid coming up and her tongue got sore. Her throat felt like someone was squeezing it. She was coughing a lot with shortness of breath sometimes. She felt "sick."

Examination was normal except for redness of the left ear, swollen, sore throat, and post nasal drainage. She was diagnosed with bronchitis.

Plaintiff had a hysterectomy in April 2006, for pelvic pain, dyspareunia, postmenopausal bleeding, and fibroids. (R. 490).

On April 11, 2006, Plaintiff followed up with Dr. Brick, who stated the EEG did demonstrate epileptiform abnormalities emanating from the temporal lobe (R. 311). The MRI was normal. Plaintiff reported she had been having "passing out spells since she was a young woman." Plaintiff's neurologic exam was normal. Dr. Brick suggested anticonvulsants. Plaintiff was concerned that her insurance was going to run out in October, 2006. Dr. Brick prescribed carbamazepine.

Plaintiff saw Certified Nurse Practitioner Mary Beth Farina-Mazur on May 8, 2006, for evaluation of reflux (R. 309). She reported a five year history of heartburn and reflux on a daily basis. She was currently taking celexa, nexium, carbamazepine, colace, Zantac, OTC Tums as needed, Tylenol as needed and albuterol inhaler as needed. She quit smoking four months earlier.

The nurse reported Plaintiff was forgetful and slow to answer, but did answer appropriately. On exam, she had mild midepigastric tenderness on deep palpation without rigidity, guarding or rebound tenderness. Musculoskeletal exam revealed full range of motion and good pulses in all extremities, with no clubbing, cyanosis, or edema.

Plaintiff presented to Dr. Piggott on May 11, 2006, for "itching all over x 1 month" (R. 352). She had moved into a new double wide, using husband's shampoo, and had an inside dog. She quit using the shampoo, but that did not help. The dog was gone, but was no better. She stayed away from the home, but that was no help. She missed two doses of medication and quit the itching. It was the seizure medication. The itching was mostly of her face. She also complained the tip of her tongue was going numb and she had increased confusion.

Examination was normal. She was diagnosed with pruritus, most likely due to Tegretol, and seizure disorder.

A June 27, 2006, upper endoscopy showed fundic and antral gastritis (R. 344).

Plaintiff followed up with Ms. Farina-Mazur on July 10, 2006 for her complaints of reflux (R. 307). The EGD revealed fundic and antral gastritis (R. 307). She was scheduled for a colonoscopy and a 24-hour pH probe, and was provided GERD and antireflux instructions.

The 24 hour pH test was "not very remarkable," and "symptoms of heartburn did not correlate with objective abnormalities" (R. 343).

A July 20, 2006, manometry was "not very remarkable" (R. 342). Lower esophageal sphincter pressure and peristalsis were normal.

Plaintiff followed up with Dr. Piggott on August 10, 2006, at which time she informed the doctor her seizure medication was not causing her itching– her husband had switched detergents

13

without telling her (R. 351). The seizure medication made her "feel like she needs to have a spell but doesn't." The spells had been increasing while off the medication, but when she landed with her hand in the toilet she started using it again. She also has to use an inhaler about everyday because she could not breathe deep. The acid was still "really bad." She was working on getting a colonoscopy. Her hair was falling out. She was gaining weight. She had two spots on her stomach that were numb. She was hot all the time. She had two moles she wanted checked.

Examination was normal, except for skin tags. She had no bald areas on her scalp. She was diagnosed with diarrhea and gastritis, seizure disorder, hot flashes, and hair loss.

Colonoscopy on September 12, 2006, was incomplete "secondary to intolerant uncooperative patient," who became progressively intolerant and combative (R. 345). The only finding was diminutive internal hemorrhoids.

A September 22, 2006, barium enema (performed in place of the incomplete colonoscopy) was unremarkable (R. 315).

Plaintiff followed up with Ms. Farina-Mazur on September 19, 2006 for her complaints of reflux (R. 305). She reported no new complaints and denied any nausea or vomiting. She reported intermittent heartburn for which she took Rolaids. She denied any frank abdominal pain.

Plaintiff presented to Dr. Piggott on November 28, 2006, for complaints of coughing and "knot on left foot" (R. 350). Her right foot was sore and her wrist was sore for one month since she passed out. She had run out of medicine. In the last week she had lots of heartburn and voice changing more often, having to clear her throat more. Her left pinky got really sore.

Exam was normal, except her left foot was tender with a cyst. Her wrist showed no abnormalities and was nontender. She was diagnosed with bronchitis, osteoarthritis of the joints with

14

cyst on foot, gastritis and seizure disorder. She was told to take her medications daily (emphasis in original).

Plaintiff followed up with Ms. Farina-Mazur on December 18, 2006 for her complaints of reflux (R. 303). The EGD and pH tests were "not very remarkable" and deemed "negative." Her symptoms of heartburn did not correlate with objective abnormalities. She was diagnosed with GERD without alarming signs or symptoms. Throughout her treatment with Ms. Farina-Mazur she was found to have normal musculoskeletal exams.

A December 27, 2006, CT of the abdomen showed no evidence of acute intraabdominal process (R. 314). It did show duodenal thickening but with no accompanying inflammatory changes, most likely therefor related to peristalsis. The MRI also showed "Mild degree of degenerative change, most prominent at the L5-S1 level."

Plaintiff presented to Dr. Piggott on December 29, 2006, for complaints of "not eating" (R. 349). She said her stomach started hurting some before Christmas, but now it was getting worse. She ate toast for 2 or 3 days. She had a CT of her chest and abdomen . She felt like her stomach was bulging and going to explode. She felt hungry, with occasional sharp pain. She was sleeping a lot. Eating made her hurt. She had pain in the right upper quadrant and left lower quadrant. She was nauseated all the time.

Examination was normal. She was diagnosed with gastritis and gastroparesis.[2]

On January 16, 2007, Plaintiff underwent an esophagram and upper gastrointestinal imaging (R. 437). The esophagram was unremarkable and the upper gastrointestinal imaging was

---

[2]A condition that reduces the ability of the stomach to empty its contents, but there is no blockage. www.ncbi.nlm.nih.gov (Accessed July 19, 2012.)

unremarkable (R. 438).

Plaintiff saw Dr. Piggott for a routine followup on March 9, 2007 (R. 348). She told the doctor that Dr. Hurko said if she lost 20 pounds she could go off meds, but "she disagree[d]" because her trouble was before her weight gain. He told her she had IBS and didn't think she needed any further workup. She was having lots of acid. Nexium helped at night but had to use Zantac regularly. She also now reported her left heel was sore in the morning, making it hard to walk, and her right knee "gives out."

Examination was normal except for her left heel which was tender. Her knee was stable with no effusion and was nontender. She was diagnosed with osteoarthritis of the knee and foot, gastritis, and seizure disorder–stable. Plaintiff was provided a nebulizer and albuterol. Her prognosis was "good." (R. 448).

On April 18, 2007, Plaintiff, presented to Dr. Piggott with complaints of a cyst on her labia (R. 347). It was slowly getting smaller and was no longer painful. Her stomach still acted up and she had reflux. Sometimes her arthritis acted up. She had no seizures unless she forgot her medications. She had osteoporosis but could not tolerate miacalcin nasal spray because it made her nose bleed and" burn like fire." She recently hurt her back because she sat in a chair "too hard." She was better, but she still needed help getting out of bed. Some days she was so sleepy, which seemed related to stress.

Examination was normal, including no labial lesions seen. She was diagnosed with lumbar strain, fatigue, GERD, seizure disorder, high cholesterol, and osteoporosis.

A bone density test on March 20, 2007, showed osteoporosis of the lumbar spine with osteopenia in the left hip (R. 472).

Plaintiff underwent a lumbar spine x-ray on March 29, 2007, for a "fall with low back pain" (R. 471). It showed no acute injury, but did indicate degenerative changes at L5-S1.

Plaintiff filed her applications on October 7, 2007 (alleged onset date in 2005).

Plaintiff completed another disability report, and was interviewed again by an SSA employee, who this time noted difficulties with understanding, coherency, concentration, answering, and sitting, but not with standing, walking, using hands, or writing. The employee stated: "She spaced out a few times during the interview, had to stand up one time, had a hard time answering the questions" (R. 234).

Plaintiff listed her conditions as arthritis, seizures, asthma, osteoporosis, stomach, acid reflux, hernia, and depression (R. 237). She reported having trouble sitting for long periods of time, trouble standing for long periods of time, inability to lift or carry anything, trouble concentrating and remembering instructions, and using a nebulizer. She stated she had to stop working in April 2005, because she had to have shoulder surgery. Her medications were boniva for osteoporosis, celexa for depression and Zantac for reflux. She reported she also took Tylenol and used a nebulizer.

Plaintiff was examined by Miraflor Khorshad, MD on referral from the State agency on November 5, 2007 (R. 361). Plaintiff's chief complaints were crying spells, aching pain in all joints, stiffness of hips, back and ankles, cannot sit or stand for long periods, and needs to rest after walking "some." Her current medications were Celexa, Lamictal, Flexeril, Questram, Belladonna, albuterol, Boniva, and Zantac.

Plaintiff reported having chronic fatigue, chronic headaches, sinus problems, sore throat, no difficulty swallowing, no stiff neck, no decreased motion to neck, no thyroid problem, no chest pain, coughing, wheezing, shortness of breath, chronic abdominal pain with nausea, vomiting, diarrhea,

constipation and hemorrhoids. She reported weakness, seizures, fainting spells, and cold intolerance. Her weight was stable.

Upon examination, Plaintiff was 5'8" tall and weighed 181 pounds. She had a normal gait with no assistive device. She was able to get on and off the examining table without assistance. She was able to heel to toe walk and sit and squat. She appeared anxious with a poor attention span "as questions were repeated several times during the interview."

She had no leg edema, joint swelling, or effusion. Both hands had prominence of the PIP joint but no swelling. Both rotators were tight, and both shoulder joints exhibited limited range of motion. She had to move the joints in order to do an abduction. Strength was 4/5 in upper and lower extremities. Otherwise she had normal range of motion throughout. She was alert and oriented and reflexes were intact. Her fine manipulation was intact and grip strength was 4/5.

Plaintiff said she had had "passing out spells" since she fell at age 9 (R. 363). She was later hit on the head by her father and passed out at age 13. She had the spells since then. She reported her last seizure as the day before, described as "darkness falling down on her" along with the urge to move her bowels. She reported memory problems. She admitted doing many chores but being unable to finish them.

Plaintiff also reported crying spells with an episode of depression in 1991. She took Prozac but discontinued it when her best friend died. She said she tried to commit suicide at age 19 after being a rape victim. The doctor reported she had some crying spells during the interview. She was now taking Celexa.

Plaintiff reported being diagnosed with osteoporosis by a Bone Density Test, for which she took Boniva. She complained of arthralgias for five years. She had a shot in both shoulders and

both knees. She had arthroscopy performed about a year ago. She complained of persistent pain in her lower back and both hips and admitted difficulty even lifting a skillet.

She was diagnosed with asthma since childhood.

Plaintiff reported stomach problems for two years, on Prevacid/Pepcid.

Diagnosis was degenerative arthritis of both shoulders and hands; history of seizure disorder; Major Depressive Disorder; rule out Attention Deficit Disorder; and history of GERD. Dr. Khorshad recommended referral for psychological evaluation and a pulmonary function test.

Plaintiff saw psychologist Robert Klein, Ed.D. on November 12, 2007, for a Mental Status Examination (R. 367). She told him she had had a "trying and crying time" with "a medical doctor from SSI who had yelled and screamed at her because she could not remember things." Her attitude became positive during the current exam. She attempted to be as fully cooperative as she could. Her posture appeared "O.K." and her gait steady. There were no involuntary movements and she used no assistive devices.

Plaintiff's chief complaint was that she still had constant pain in her right shoulder area even after an operation to scrape the bone. Her arthritis and osteoporosis made it difficult for her to sit, stand, and move. She told Dr. Klein that the "SSI doctor" said that she had a bipolar disorder, and that she disagreed. She had a previous history of various antidepressants and said she stopped working in 2005 after her shoulder surgery.

Plaintiff appeared moderately depressed. She had a problem with sleep, at most 3-4 hours per night. She had constant pain in her right shoulder. She had occasional panic attacks. She had lost interest in everything. She had problems with her memory and completing tasks. Her appetite was good, her energy level was average and she had frequent crying episodes.

19

Upon Mental Status Examination, Plaintiff's appearance was casual, hygiene, grooming, and posture appropriate, and gait steady. Her attitude was positive, her cooperation was good, her eye contact was good, her social interaction during the evaluation was normal, but her social interaction was generally mildly deficient. Her length and depth of verbal responses was normal. She had a sense of humor, but was not spontaneous. Her speech was normal and not pressure. She was fully oriented. Her mood was "dysphoric." Her affect was broad, thought processes and content normal, perception and insight normal, and comprehension average. Her immediate and remote memory were normal, but recent memory was markedly deficient, as based on recall of 0 of 4 words after 30 minutes. Her concentration was mildly deficient, but pace, persistence and psychomotor behavior were normal. Her social functioning was within normal range.

Plaintiff described her daily activities as getting up at about 7:00 am, caring for her own personal hygiene, including showering, and doing most of the cooking, cleaning, dishes, and the laundry. She may play with her grandchildren. She watched tv only with her grandchildren. She drove, but was advised to restrict driving to short distances. She shopped. She preferred to stay at home. She liked to read and listen to the radio. Her other hobbies were listed as "crafts." She spent time only with family. She usually went to bed at 10:00 pm, but had difficulty sleeping.

Dr. Klein diagnosed Major Depressive Disorder, Recurrent, Moderate (R. 369). He noted there "did not appear to be any suggestion of a bipolar disorder."

On November 19, 2007, State agency reviewing psychologist Joseph Shaver, Ph.D., completed a Psychiatric Review Technique ("PRT"), opining Plaintiff had an affective disorder (Major Depressive Disorder, Recurrent, Moderate) under 12.04 but that it was not severe (R. 371). He opined she had no limitation in restriction of activities of daily living, no difficulties maintaining

social functioning, mild difficulties maintaining concentration, persistence, or pace, and no episodes of decompensation, each of extended duration (R. 381).

A December 11, 2007, Ventilatory Function Test showed Plaintiff had evidence of bronchospam without acute respiratory illness (R. 388).

On January 8, 2008, State reviewing physician Porfirio Pascasio, MD, completed a Physical Residual Functional Capacity Assessment ("RFC") based on osteoarthritis, seizures, asthma and GERD (R. 389). He opined Plaintiff could occasionally lift and carry 20 pounds and frequently lift and carry 10 pounds. She could stand and/or walk about 6 hours in an 8-hour workday and sit about 6 hours in an 8-hour workday. She could never climb ladders, ropes or scaffolds, and could occasionally perform all other postural limitations. She had no manipulative, visual, or communicative limitations established (R. 292). She should avoid concentrated exposure to temperature extremes, fumes, odors, dust, etc. and hazards. The doctor noted he could not assess her credibility because no function report and no activities of daily living were available (he stated she had not returned them). Dr. Pascasio also stated that he reviewed a 1/22/2007 "ROC" and Plaintiff was not compliant with her meds and had been told by her physician that she does not have grand mal seizures. This new information did not change his RFC (R. 397).

Plaintiff filed a disability report for her appeal of the unfavorable SSA decision in March 2008 (R. 248). She noted a change in her conditions as follows: "The acid reflux is worse – my back hurts more in the bottom & middle. And foot when knees & back give out." She stated the approximate date these changes occurred was March 1, 2008 (R. 249). She twisted her left foot "when her back and knee gave out" on March 14, 2008, and she had a limp. She was currently taking only Tylenol and Zantac. She stated she now had no insurance. She wrote a long narrative

of her impairments, which did include having to write in short sessions because of arthritis, but did not specifically mention shoulder pain, neck pain, or being unable to reach or grasp.

On April 7, 2008, State Agency reviewing Psychologist Phillip E. Comer completed a PRT of Plaintiff, finding she had an affective disorder (Major Depressive Disorder, Recurrent, Moderate), But that the impairment was not severe (R. 398). He opined she would have mild restriction of activities of daily living, mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence or pace, and had no episodes of decompensation, each of extended duration (R. 408).

On April 9, 2008, State agency reviewing physician Fulvio Franyutti completed an RFC, opining Plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently; could stand and/or walk 6 hours in an 8-hour workday, and could sit 6 hours in an 8-hour workday (R. 413). She could never climb scaffolds, ropes, or ladders, and could occasionally perform all other posturals. She had no manipulative, visual or communications limitations. She should avoid concentrated exposure to temperature extremes, fumes, odors, dust, etc., and hazards, but had no other environmental limitations. She appeared partially credible, and her allegations were partially supported by the findings.

On June 4, 2008, Plaintiff began treatment at Seneca Health Services ("Seneca") for depression and anxiety (R. 466).

A psychiatric evaluation was completed on June 12, 2008, by Donna Meadows, a Nurse Practitioner (R. 464). Plaintiff had presented for a chief complaint of depression and anxiety. She currently took 40 mg. Celexa per day. She was taking Lamictal but stopped it due to losing her insurance. She said it helped with her moods, but was prescribed due to mild seizure activity. Now,

with no medication, she at times felt a sense of darkness around her and got very nauseated. She said she suffered from depression and anxiety since childhood and had been prescribed amitriptyline, Zoloft, Prozac, and now Celexa. She said she had been treated for 20 years. She said she "gets easily irritated at times." Celexa "works well for the most part." She had a hard time remembering to take it. She felt depressed "at times." Her sister died one year ago this date. She reported a low energy level. She slept a lot in the day time and then had trouble sleeping at night. Her husband "had a head injury and suffered severe head trauma and has cognitive problems. She has to deal with this also." She reported poor memory and concentration. She said she worried a lot, felt anxious a lot of the time and had occasional panic attacks. Her appetite was good.

Plaintiff had no psychiatric hospitalizations. She said she attempted suicide after being raped at age 19, using her grandfather's pain pills, but he made her throw them up and she was not hospitalized.

Without medication, Plaintiff reported she "maybe still has mini seizures, the last one being one month ago." She denied any head injuries. She smoked a pack of cigarettes a day.

On Mental Status exam, Plaintiff was fully alert (R. 465). She was casually dressed with good hygiene. Her mood was depressed and tearful at times. She was "somewhat anxious." Her affect was a bit broad. Her speech was clear, logical, and linear, and thought content was normal. She appeared to be of average intelligence. Immediate, recent, and remote memory appeared intact, with fair insight and good judgment.

The diagnosis was Major Depressive Disorder, Recurrent, Moderate, and Anxiety Disorder, NOS. Her GAF was assessed at 50 (R. 465).

Plaintiff saw Nurse Meadows two weeks later, (6/26/2008) for pharmaceutical management

( R. 463). She said she was doing "pretty well." She had been "working hard lately." She only took the Ativan one time and said it did make her sleepy. Her biggest problem now was not sleeping, averaging three to four hours per night. The diagnosis was the same. Trazodone was added for sleep.

Plaintiff underwent a psychological evaluation with psychologist William Haggerty on July 2, 2008 (R. 461). On mental status evaluation she was fully oriented. She said she was concerned with her lack of concentration. Her sleep was restless and she awoke during the night. She reported her appetite as "too good."

Plaintiff was given the Minnesota Multiphasic Personality Inventory (MMPI-2)[3] (R. 461). The results were reported to "very likely be invalid." Dr. Haggerty nevertheless found the results indicated Plaintiff lacked social contacts and interpersonal relationships which made her feel isolated and undervalued as a person. He recommended therapy to help her explore ways to establish and maintain relationships. He diagnosed her with Major Depressive Disorder, Severe, Recurrent, Anxiety Disorder, NOS, and Dependent Personality Disorder, with a GAF of 50.

Plaintiff returned to Nurse Meadows on July 24, for medication management (R. 460). She said she was doing fairly well, with good days and bad days. She said the last couple of weeks had been "hectic." The trazodone helped her sleep "but is only going to take it on [an as-needed] basis because sometimes she sleeps too much." Her appetite was okay. She wanted to continue on her present medications at present dosages. Ms. Meadows still diagnosed her depression as moderate. She continued her prescriptions for celexa and trazadone.

---

[3] The MMPI-s is a self-report instrument designed to aid in the assessment of a wide range of clinical conditions. http://www.upress.umn.edu/test-division/mmpi-2 (Accessed August 22, 2012).

Plaintiff reported to Ms. Meadows on August 7 for medication management, noting she had a bad week last week "and made a fool out of herself with her therapist" (R. 458). She said she was just having a bad week. She did not really want to be on medication. She did not really want to be on celexa, but it helped her depression and kept her from crying all the time. She said her memory was poor. She was trying to make an appointment with a neurologist, because she was having some times "where she feels she is just not right" and said she "should be able to deal with her stress and not have to take medicine for it." She was sleeping okay.

On September 8, 2008, Plaintiff had a chest x-ray for left side chest pain and cough (R. 484). It showed chronic interstitial change of the lungs, but was otherwise unremarkable with no signs of acute infiltrates or failure.

Plaintiff next saw Ms. Meadows on October 2, 2008, for medication management (R. 456). She reported being "more stressed out." She said her husband, who had had a stroke, had been more irritable the past two weeks and every now and then he went through these kinds of spells making it hard on her. She took trazodone as needed for sleep. Her mood was a little better, but still remained depressed "at times." Her energy remained poor. Her short-term memory remained poor. She said she still felt fatigued a lot during the day.

On October 17, 2008, Plaintiff had a stress test for her complaints of chest pain and left shoulder pain (R. 482). It revealed no ischemia or infarct.

Plaintiff presented to the hospital on October 5, 2008, with complaints of fever, chills, congestion, and cough for two weeks (R. 480). She also complained of her scalp itching. She was diagnosed with pneumonia, scalp itching, gas, and depression.

Plaintiff's Date Last Insured was December 31, 2008.

Plaintiff saw Ms. Meadows on January 7, 2009, for medication management (R. 455). She reported she had had pneumonia and was still not feeling well. She said her short term memory remained poor but Celexa did help. She could tell the difference if she did not take it. She did not feel overly depressed, and only took the Trazodone on an as-needed basis for sleep. She wanted to continue the same medications at the same dosages.

On January 29, 2009, Plaintiff had a chest x-ray for a diagnosis of pneumonia (R. 479). It was normal.

On May 29, 2009, Plaintiff underwent a thoracic spine x-ray which was normal (R. 476).

On May 29, 2009, Plaintiff underwent a lumbar spine x-ray which showed degenerative changes in L5-S1, including degenerative lipping and narrowing. The vertebral heights were maintained.

On May 29, 2009, Plaintiff underwent x-ray of the neck which showed mild degenerative change at C6-7 with slight narrowing of that disk space, otherwise unremarkable (R. 478).

Plaintiff saw Ms. Meadows on October 22, 2009, over 9 months since her last visit (R. 454). She reported she was feeling "maybe a little better." She felt fatigued that day, saying she did not sleep well last night. She only took the Trazodone "when she has to." Her husband was doing a little better, making things go a little easer. She said she felt her mood was a little improved.

Plaintiff next saw Ms. Meadows on February 10, 2009, almost four months after her last visit (R. 453). She reported having "some periods" of anxiety. This was related a lot to her husband and his outbursts of anger and laughing. She said she "just becomes very anxious and nervous when he is having one of his spells." The Celexa worked pretty well for her depression and trazodoone helped with sleep. She took it as needed. She requested a prescription for Ativan, which was given.

On March 10, 2009, Plaintiff presented to Ms. Meadows for a psychiatric evaluation (R. 451). Plaintiff reported she was doing pretty well. She slept ok at times. Ativan helped with anxiety. She normally had to take it only once a day. She said she did not eat much during the day, but her appetite increased at night. She was trying to do better with her memory and concentration. She was able to read books with only minor problems concentrating. Her diagnosis was now Major Depressive Disorder, Recurrent, Mild, and Anxiety Disorder, NOS. Her GAF was 60.

On March 31, 2009, Plaintiff attended a therapy session with social worker Lisa Morris (R. 573). She reported an outburst, yelling at her husband and daughter. She told them how she felt, that she still only had time to herself in the evenings, yet had been trying to stay busy to cope. Her mood was good, she was mildly anxious, and she was fully oriented, but distracted at times. She seemed to be coping better even as stressors continued.

Plaintiff presented to Ms. Meadows on April 23, 2009 for medication management (R. 450). She said she was doing fairly well. She had some stress at home, but believed her medications were working well. She was sleeping okay. She continued to feel anxious "at times." Her depression was again listed as mild.

Plaintiff reported to her therapist on April 23, 2009, that her stressors at home continued and she was trying to cope by getting some time to herself (R. 572). Her anxiety continued, and she felt overwhelmed at times. She appeared depressed and mildly anxious, but fully oriented.

On May 13, 2009, Plaintiff presented to a nurse practitioner with complaints of chronic neck pain, "stiff since November." (R. 579). There was no radiculopathy and no injury. She described the pain as "stiff." There was no decreased range of motion. She had had no seizure activity. The diagnosis was neck pain, possible muscle strain, lower back pain and seizure disorder well

27

controlled.  She was encouraged to quit smoking, but was "not interested."

Plaintiff told her therapist on May 14, 2009, that she had lack of time for herself, was feeling overwhelmed, had difficulty setting time limits with others, and felt frustrated (R. 571).  Her mood was irritable at times.

On May 29, 2009, Plaintiff was diagnosed with low back pain, cervicalgia, and cervical spondylosis without myelopathy (R. 653).

Plaintiff reported to her therapist on June 11, 2009, that stressors continued with her husband "with his moods" (R. 570).  She tried to find time to herself, but it was only at night.  She felt guilty at times trying to set limits with others.  Her mood was mildly depressed and mildly anxious.

On July 6, 2009, Plaintiff presented to her regular provider with complaints of "some pain and decreased strength in right arm/hand" (R. 577).  Upon exam, her hand had no swelling, and no medial/lateral epicondyles.  She had some pain at the elbow, but negative Phalen's and Tinnel's signs. Regarding her arms/hands, she was simply diagnosed with status post carpal tunnel release. She was again told to quit smoking, and stated she quit "yesterday."

Plaintiff reported to her therapist on July 9, 2009, that stressors continued with her family (R. 569).  Her mood was irritable at times.

On July 20, 2009, Plaintiff had a medication management appointment with Ms. Meadows (R. 568).  She reported she was doing ok.  She continued to have trouble with anxiety at times. Ativan helped somewhat.  She only took trazadone on an as-needed basis, when she had difficulty sleeping.  Her appetite was ok.  She remained depressed "at times."  Her depressive disorder continued to be diagnosed as "mild."

Plaintiff presented to Health Right on July 6, 2009 with complaints of some pain and

decreased strength in the right arm and hand (R. 577). Exam was normal. Her assessment was anxiety, unspecified; high cholesterol; seizure disorder; status post carpal tunnel surgery; and mild left carotid stenosis. She said she quit smoking "yesterday."

Plaintiff presented to her therapist on July 31, 2009, reporting anxiety and depression continued, depending on her relationship with her husband and her mother. She had no time to herself, then became overwhelmed and irritable. Her mood was mildly depressed and mildly anxious, but her affect was appropriate.

X-rays of the right wrist on August 31, 2009, after Plaintiff fell, showed mild degenerative change involving the carpometacarpal joints and an old nonunion fracture of the ulnar styloid, well corticated. (R. 664.)

On September 24, 2009, Plaintiff went to Health Right for her "seizure disorder." She reported having had three types of "spells" for years. She did well on Lamictal but had no insurance. She was tried on Trileptal but said she couldn't function on it. She had low energy. She said she had a head injury as a child. She was prescribed a trial of depakote.

Psychologist Sharon Joseph conducted a psychological evaluation of Plaintiff on October 7, 2009 (R. 580), upon referral by her attorney (R. 580). Plaintiff was administered the MMPI-2 (R. 584). In this case it was considered to be valid; however, the psychologist noted the profile "should be interpreted with caution," stating: "There is some possibility that the clinical report is an exaggerated picture of the present situation and problems. She is presenting an unusual number of psychological symptoms."

On Mental Status Examination, Plaintiff was neatly and cleanly dressed, and of average height and weight. She reported some problems with dexterity of her right hand and some difficulty

29

ambulating due to back and knee problems. She reported variable appetite and sleep difficulties. Her mood was depressed. She stated that last week she had suicidal ideation without intent or plan. She was fully alert and oriented. Immediate, recent, and remote memory were all within normal limits. Concentration was mildly impaired. Plaintiff described her daily activities as getting up at 9:30 am, washing her face, fixing her hair, brushing her teeth, and then sitting a couple of hours. She then worked on the house. In the afternoon she straightened the house and sometimes fixed dinner. In the evening she worked on the house, read, watched tv, and played games. She went to bed between 11:30 pm and 3 am. She was able to make the bed, run the vacuum, wash dishes, cook a meal, clean the bathroom, put groceries away, wash windows, iron clothing, and mop the floor. She could drive and go grocery shopping. Her judgment was within normal limits.

Plaintiff reported having few acquaintances. Her best friend died. She said "I don't seem to enjoy anything anymore." She used to like to cook and sew. She sometimes did have lunch with a friend. Interaction during the interview appeared somewhat impaired secondary to depression. Socialization was considered moderately impaired.

Dr. Joseph diagnosed Plaintiff with Major Depression, Recurrent, Severe; Anxiety Disorder, NOS; and Rule Out Cognitive Disorder. Her GAF was 53. She specifically stated Plaintiff's impairments in concentration, attention, and working memory were not significant enough to warrant a diagnosis of Cognitive Disorder.

Plaintiff presented to her therapist on October 14, 2009, reporting not doing well recently, with bad memories of the past, relationship stressors–family, medical problems – hurt back recently with Bronchitis and coughing too hard, and worry about her sister who was ill (R. 609). Her mood was depressed, anxious, tearful, with no suicidal ideations. She was fully oriented.

On October 20, 2009, one-time examining psychologist Sharon Joseph completed a mental RFC opining Plaintiff would have moderate limitations in understanding and carrying out detailed instructions; sustaining attention and concentration for extended periods; maintaining regular attendance and punctuality; completing a normal workday and workweek without interruptions from psychological symptoms and performing at a consistent pace without an unreasonable number and length of work breaks; interacting appropriately with the public; responding appropriately to direction and criticism by supervisors; working in coordination with others without being unduly distracted by, and without unduly distracting them; relating predictably in social situations in the workplace without exhibiting behavioral extremes; demonstrating reliability; ability to respond to changes in the work setting or work processes; setting realistic goals and making plans independently of others; and ability to tolerate ordinary work stress. She would have a marked limitation only in her ability to travel independently in unfamiliar places. Otherwise she would have only mild difficulties (R. 589-593). Dr. Joseph also opined that Plaintiff's impairments and limitations probably existed at their current level since September 2004.

Dr. Joseph also completed a PRT, based on a depressive disorder and anxiety disorder NOS (R. 599). She found Plaintiff would have moderate restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence and pace (R. 604).

A scan of the lumbar spine, hip, and pelvis on October 29, 2009, showed osteoporosis of the lumbar spine and osteopenia of the left hip (R. 639).

A lumbar spine series that same date showed mild degenerative change of the lumbar spine which was osteoporotic (R. 640). She was diagnosed with osteoporosis.

Plaintiff presented to her therapist on November 4, 2009, reporting she had tried some journal writing and this helped somewhat (R. 610). She reported not feeling well with medical problems and physical pain. She reported some time to herself but limited. Her mood was depressed and anxious. She denied any suicidal ideation. Her eye contact was good and she was fully oriented.

On November 12, 2009, Ms. Meadows completed a mental RFC, opining Plaintiff would have moderate limitations in understanding and remember and carrying out detailed instructions; sustaining attention and concentration for extended periods; maintaining regular attendance and punctuality; completing a normal workday and workweek without interruptions from psychological symptoms and performing at a consistent pace without an unreasonable number and length of work breaks; interacting appropriately with the public; working in coordination with others without being unduly distracted by them; ability to respond to changes in the work setting or work processes; carrying out an ordinary work routine without special supervision; setting realistic goals and making plans independently of others; traveling independently in unfamiliar places; and ability to tolerate ordinary work stress. Otherwise she would have mild or no limitations. Her impairments were thought to have existed since September 2004 (R. 616).

Ms. Meadows also completed a PRT based on organic mental disorder, depressive syndrome, and anxiety. She stated Plaintiff would have a mild restriction of activities of daily living , but that there was insufficient evidence to opine about social functioning, concentration, persistence or pace.

An MRI of the lumbar spine on November 14, 2009, for left leg numbness and low back pain "for one month" showed spondylosis at L5-S1 with a generalized disc bulge causing mild canal and bilateral exit foraminal encroachment and shallow central disc bulge at L4-5 without compressive sequelae (R. 634-635).

32

At the Administrative Hearing held on November 18, 2009, Plaintiff testified her worst impairment overall was "crying" (R. 68). Her worst physical problem was her lower back.

Plaintiff testified she could not "run the sweeper over [her] whole house at the same time." She had to do one room or maybe a couple of rooms at a time (R. 83). At the immediate time of the hearing she was not vacuuming because she had just pulled her back out and she was "waiting for it to heal a little bit, because [her] son [was] coming in and, you know, I really want to do Christmas dinner and standing at the stove is really uncomfortable." (R. 83).

Plaintiff was asked "about her arms and her shoulders." Specifically, "Do you have any difficulty with either of your shoulders?" She replied, "Yeah, I have trouble reaching over my head. I had surgery on my right shoulder." (R. 86). She was asked if she had any difficulty maneuvering her shoulders to put jackets or sweaters on or off, to which she responded: "Only when my shoulders are in their stiff mode. Most of the time, no, not really." When asked how often she got in a stiff mode, she answered, "Well, first thing in the morning, I am really stiff." It would take her a couple of hours to "loosen up." Her lower arms and hands were also numb in the morning, probably due, she said, to carpal tunnel (R. 87). Her shoulders would "flare up" if she used her hands a lot or slept on them wrong. She used as an example that she had quit canning spaghetti sauce because the motions, stirring and pouring it in the jars, made her shoulders hurt so bad. She didn't skin potatoes because she couldn't hold the knife. That had been "gotten worse in the last couple of years." (R. 88).

On January 14, 2010, Plaintiff told Ms. Meadows she was "doing pretty good." She was pleased with her current medications. She had gained some weight but believed it was because she quit smoking three months earlier and was eating a little more. She enjoyed the snow. She was

sleeping okay (R. 699). She was diagnosed with major depressive disorder, recurrent/mild and anxiety disorder NOS.

On February 16, 2010, Plaintiff presented to her treating physician with complaints of "Falling apart" (R. 686). She said she had been going to Health Right then mentally fell apart. She saw a counselor. Her hair was falling out "like anything." She was "moody as all get out." Upon exam, she was fully alert and oriented, her affect was pleasant, her neck was supple, and her extremities showed no cyanosis or edema. She was diagnosed with hair loss, depression, and seizure disorder.

In October 2010, Plaintiff's problem list was: reflux, asthma, GERD, headaches, migraine headaches and seizures." She was taking only trazodone and ativan.

Nearly a year after the administrative hearing, Plaintiff was referred to Mujheed Rahman for complaints of pain, numbness, and weakness of both arms for about ten or twelve years. Her only medications were celexa, nexium, simvastatin, Zantac and requip (R. 671). She smoked a pack a day. She also complained of skin rash, dry eyes, blurring vision, decreased hearing, sore mouth, wheezing and shortness of breath, ulcer and heartburn, muscle weakness, depression, crying spells, and nervous problems.

Upon examination, her neck was supple and muscle tone and bulk were normal. Strength was symmetrical in both upper and lower extremities. Sensory exam was unremarkable. Finger to nose test and gait were both normal. She could walk on toes and heels. Tinel's and Phalen's were positive. The impression was bilateral carpal tunnel syndrome, with plans for nerve conduction studies and EMG. All the tests were normal. "There is no electrodiagnostic evidence of carpal tunnel syndrome or ulnar neuropathy or polyneuropathy or cervical radiculopathy." (R. 674).

On February 7, 2011, more than two years after her date last insured, Plaintiff visited her doctor for hand pain, hip pain and skin rash. The hand pain was "especially the right .... she thinks it is RA." She had had tests for carpal tunnel which were negative, but "It really bothers her when she is sewing it is hard to hold the needle." Upon examination her neck had normal range of motion and was supple. She exhibited tenderness in both elbows and had generalized osteoarthritic changes of the fingers and wrists.

On February 9, 2011, Plaintiff told Ms. Meadows she was doing ok and planned to go to Indiana to visit her son who was going to be deployed to Afghanistan. She was a little anxious about this. On February 11, 2011, Plaintiff was diagnosed with GERD, Osteoarthritis, epicondylitis of the elbow, and seizures.

### III. ADMINISTRATIVE LAW JUDGE DECISION

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. § 404.1520 (2000), ALJ Moon made the following findings:

1. The claimant last met the insured status requirements of the Social Security Act on December 31, 2008 (R. 18).

2. The claimant did not engage in substantial gainful activity during the period from her alleged onset date of April 1, 2005, through her date last insured of December 31, 2008 (20 CFR 404.1571 *et seq.*) (R. 18).

3. Through the date last insured, the claimant had the following severe impairments: degenerative disc disease of the lumbar spine, including mild osteoporosis; tendonitis of the right shoulder; seizure disorder unspecified and controlled; Major Depressive Disorder; and Anxiety Disorder not otherwise specified (20 CFR 404.1520(c)( (R. 18).

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526) (R. 19).

5.     After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except that she needs the opportunity to change positions briefly after sitting for 30 minutes or standing for 20 to 30 minutes, as needed. She was unable to use her right upper extremity for work above the shoulder level. She was unable to climb ladders, ropes or scaffolds, or crawl and could only occasionally climb ramps and stairs, balance, stoop, kneel, and crouch. She needed to avoid concentrated exposure to excessive cold, dampness, dust and fumes. She was unable to work in or around crowds, and was limited to occasional interaction with the public of a superficial nature. The claimant was unable to perform work requiring sustained immediate memory or fast production rate pace (R. 22).

6.     Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565) (R. 32).

7.     The claimant was born on February 25, 1956, and was 49 years old, which is defined as a younger individual age 18-49, at the time of her alleged onset date. The claimant subsequently changed age category to closely approaching advanced age, and was closely approaching advanced age at her date last insured (20 CFR 404.1563) (R. 32).

8.     The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564) (R. 42).

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2) (R. 32).

10.     Through the dated (sic) last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)) (R. 32).

11.     The claimant was not under a disability, as defined in the Social Security Act, at any time from April 1, 2005, the alleged onset date, through December 31, 2008, the date last insured (20 CFR 404.1520(g)) (R. 33).

(R. 16-33)

# IV. DISCUSSION

## A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). The Fourth Circuit held, "Our scope of review is specific and narrow. We do not conduct a de novo review of the evidence, and the Secretary's finding of non-disability is to be upheld, even if the court disagrees, so long as it is supported by substantial evidence." Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir.1986). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'" Hays, 907 F.2d at 1456 (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

## B. Contentions of the Parties

Plaintiff contends:

1. The ALJ erroneously omitted from severe impairments cervical disc disease at C5-6, C6-7; left shoulder tendonitis; degenerative arthritis of both shoulders, both hands and right wrist; and status/post bilateral carpal tunnel release with residual/recurrent

symptoms.

2.      The ALJ erroneously failed to include limitations in reaching bilaterally, or in handling or fingering in his RFC.

3.      The ALJ erroneously relied upon jobs ALL of which required continuous or frequent reaching and continuous or frequent handling [grasping/gripping]. The two sedentary jobs relied upon also required continuous or frequent fingering [fine manipulation]. This omission by the ALJ was prejudicial because the vocational expert ruled out all the jobs on the basis of occasional grasping, manipulation, and reaching.

4.      The ALJ's credibility analysis is faulty when he utilized an incorrect pain standard in finding that the plaintiff's subjective symptoms and limitations were not credible and failed to conduct an adequate analysis of the Step Two Credibility determination.

The Commissioner contends:

1.      The ALJ appropriately evaluated the severity of Plaintiff's impairments and reasonably assessed her Residual Functional Capacity.

2.      Plaintiff's severity argument fails in fact and law.

3.      The ALJ reasonably assessed Plaintiff's Residual Functional Capacity.

4.      The Occupations identified by the Vocational Expert rest on substantial evidence.

5.      The ALJ reasonably assessed Plaintiff's credibility.

## C. Date Last Insured

As a threshold matter, there is no dispute that Plaintiff must prove she was disabled on or before her date last insured, December 31, 2008. The relevant time frame is therefore from her alleged onset date of April 1, 2005, through December 31, 2008.

## D. Neck and Upper Extremity Impairments

Plaintiff focuses her arguments on her complaints of neck, shoulder, arm, and hand

impairments.[4] Plaintiff first argues that the ALJ erroneously omitted from severe impairments cervical disc disease at C5-6, C6-7; left shoulder tendonitis; degenerative arthritis of both shoulders, both hands and right wrist; and status/post bilateral carpal tunnel release with residual/recurrent symptoms. She then argues that the ALJ erred by failing to include limitations in reaching bilaterally, or in handling or fingering in his RFC. Finally, she argues the ALJ erred by relying on jobs named by the Vocational Expert ("VE") all of which required continuous or frequent reaching and continuous or frequent handling [grasping/gripping] or frequent fingering.

The ALJ found Plaintiff had the severe impairments of degenerative disc disease of the lumbar spine, including mild osteoporosis; tendonitis of the right shoulder; seizure disorder, unspecified and controlled; major depressive disorder; and anxiety disorder (R. 8). He followed this finding with an explanation of his reasoning for finding other impairments not to be severe, including history of carpal tunnel syndrome, chondromalacia of her knees, and GERD. Of these, Plaintiff argues only regarding her carpal tunnel syndrome, contending her "status post bilateral carpal tunnel release with residual/recurrent symptoms" was a severe impairment.

---

[4]In her Conclusion, counsel for Plaintiff states:

> In the opinion of the undersigned, there were so many errors in the decision that it was difficult to pick which arguments to include in this brief. Plaintiff hopes that the arguments decided upon will be clear and persuasive to the Court and that the final decision will be reversed. For these <u>and other errors apparent in the reocrd</u> Plaintiff asks the Court to reverse the decision of the ALJ and grant her motion for summary judgment. (emphasis added).

L.R.Civ.P.9.02(g) requires that claims or contentions by the plaintiff alleging deficiencies in the ALJ's consideration of clams or alleging mistaken conclusions of fact or law must include a specific reference, by page number, to the portion of the record that (1) recites the ALJ's consideration or conclusion and (2) supports the party's claims, contentions or arguments. The undersigned finds that "other errors apparent in the record" that were not specifically included do not comply with the local rule, and are therefore not addressed.

At step two of the sequential evaluation, Plaintiff bears the burden of production and proof that she had a severe impairment. Grant v. Schweiker, 699 F.2d 189, 191 (4th Cir. 1983). A mere diagnosis of a condition is not enough to prove disability. There must be a showing of related functional loss. See Gross v. Heckler, 785 F.2d 1163 (4th Cir. 1986).

Plaintiff underwent bilateral carpal tunnel surgery in 1999 (after totally negative test results). This was long before her alleged onset date and she worked afterward. See Cauthen v. Secretary, 426 F.2d 891 (4th Cir. 1972)(finding claimant was not disabled where she had eye problems of long standing, worked regularly for years despite the problem, and had no significant deterioration). Nearer to her alleged onset date, Plaintiff told orthopedic surgeon Snead "she had difficulty getting her arms over her head and behind her back," but did not report any other problems with reaching, or any problems with gripping or handling. On January 9, 2006, Plaintiff was referred to neurologist Stefanick for her complaints of "spells," at which time she reported she had carpal tunnel syndrome. On exam, the doctor found numbness of the left hand and positive Tinel's sign. After Plaintiff applied for benefits in October 2007, she was examined by Dr. Khorshad on referral of the State agency, who diagnosed degenerative arthritis of the hands, but not carpal tunnel syndrome. He found her fine manipulation was intact and her grip strength was 4/5.

On July 6, 2009, six months after her DLI, Plaintiff reported "some pain and decreased strength in the right arm and hand." The exam was normal, including negative Phalen's and Tinel's signs. She was diagnosed with "status post carpal tunnel surgery."

Nearly a year after the administrative hearing (two years after her date last insured and 6 years after her alleged onset date), Plaintiff was referred to Dr. Mujheed Rahman for complaints of pain, numbness, and weakness of both arms for about ten or twelve years. Strength was symmetrical

in both upper and lower extremities and sensory exam was unremarkable. Finger to nose test and gait were both normal. Tinel's and Phalen's were positive. Dr. Rahman's impression at that time was bilateral carpal tunnel syndrome. He scheduled Plaintiff for for nerve conduction studies and EMG. All tests were normal, resulting in the following conclusion: "There is no electrodiagnostic evidence of carpal tunnel syndrome or ulnar neuropathy or polyneuropathy or cervical radiculopathy." (R. 674). Nine months later, in November 2010 (nearly two years after her date last insured), Plaintiff told Dr. Rahman she had bilateral hand and wrist pain, weakness, and inability to sew and hold a book when she read. Dr. Rahman diagnosed arthritis.

Based on all of the above, the undersigned finds substantial evidence supports the ALJ's determination that Plaintiff's status post carpal tunnel surgery was not a severe impairment and did not cause functional limitations.

Plaintiff has been diagnosed with arthritis of the hands and wrist. Again, however, a diagnosis is not enough without a showing of related functional loss. Again, Plaintiff did not report problems with her hands to Dr. Snead. She complained of a sore wrist in November 2006, after falling on it. The assessment was osteoarthritis of joints. A year later, Dr. Khorshad diagnosed degenerative arthritis of the hands, but found her fine manipulation was intact and her grip strength was 4/5. Long after her Date Last Insured Dr. Rahmad first diagnosed carpal tunnel syndrome, with a differential diagnosis of ulnar neuropathy or polyneuropathy or cervical radiculopathy. When tests for all of the above were negative and normal, he diagnosed arthritis. On February 7, 2011, more than two years after her Date Last Insured, she told her doctor she had hand pain, and "thinks it is RA [rheumatoid arthritis][5]." She told her doctor her hands her pinky finger and next finger went

---

[5]The undersigned could find no diagnosis of rheumatoid arthritis in the record.

41

numb and her knuckles ached. The pads at the base of her thumbs and little finger throbbed. "It really bothers her when she is sewing it is hard to hold the needle." On physical exam, she had "generalized osteoarthritic changes of the fingers and wrists." Three months later, the same doctor found no edema and no tenderness and did not diagnose any arthritis of any kind.

Based on all of the above, the undersigned finds substantial evidence supports the ALJ's determination that Plaintiff's degenerative arthritis of the wrist and hands and status post carpal tunnel syndrome were not severe impairments, and also supports his finding that she would have no functional limitations on gripping or fine motor work.

Plaintiff also argues that the ALJ erred by not finding her cervical disc disease a severe impairment. Plaintiff did report pain in her neck, particularly after the three motor vehicle accidents. Notably, however, these were long before her alleged onset date. X-rays in 1998, showed disc space narrowing with mild hypertrophic changes at the C6-7 level, and mild impingement upon the C6-7 neural foramina. In 2000, after another accident, x-rays showed disc space narrowing at C6-7 with minimal osteophytes and very mild narrowing of the C5-6 disc space. X-rays only one month later showed spondylolytic degenerative hypertrophic spurring at C6-7 on the left, with no signs of herniation or marked narrowing of the spinal canal, no definite compression of the thecal sac, and no spinal stenosis. Significantly, Plaintiff worked after all three of these accidents, in 2003 earning over $12,000.00. In 2007, she reported to Dr. Khorshad no decreased motion of the neck. On May 13, 2009, almost five months after her date last insured (December 31, 2008), Plaintiff complained of chronic neck pain and stiffness "since November." There was no radiculopathy. She described the "pain" as "stiff." Upon exam there was no decreased range of motion. The diagnosis was neck pain, possible muscle strain. On May 29, 2009, fully five months after her date last insured, a neck

x-ray showed only mild degenerative changes at C6-7, with slight narrowing of the disc space, otherwise unremarkable. Vertebral body heights and soft tissues were unremarkable.

The undersigned finds substantial evidence supports the ALJ's not finding Plaintiff's cervical disc disease to be a severe impairment, and also supports his not according any functional limitations specifically to this impairment.

The ALJ did find that Plaintiff's tendonitis of the right shoulder was a severe impairment. He included in his RFC a limitation of no work above the shoulder level with that arm. He did not find any severe impairment of the left shoulder and did not find any functional limitations for her left arm.

Plaintiff told orthopedic surgeon Snead she had difficulty getting both arms over her head and behind her back. Dr. Snead found both shoulders demonstrated only 90 degrees of abduction, with pain getting both arms behind her back, and positive impingement sign. The May 13, 2005, MRI of her shoulders showed <u>bilateral</u> chronic tendon degeneration versus partial under surface tear of the distal supraspinatus tendon. After a series of shots offered no relief, Dr. Snead performed an arthroscopic rotator cuff decompression of the right shoulder, arguably because it was her dominant hand, and she said it was more painful. One month later, Plaintiff reported doing better. She now had 160 degrees of abduction. She had lost some internal rotation but her pain was much better, and Dr. Snead opined she was "going to be okay." All this was clearly regarding only her right arm. One month later, she reported her shoulder was "still sore." Another month later, she still reported both shoulders were very sore, and that in the morning she couldn't move because her shoulders were very stiff. In 2007, Dr. Khorshad found both rotators were "tight" and both shoulder joints exhibited "limited range of motion." He diagnosed degenerative arthritis of both shoulders and hands.

degenerative arthritis of both shoulders and hands.

At the administrative hearing, Plaintiff was asked "about her arms and her shoulders" at the hearing. Specifically, "Do you have any difficulty with either of your shoulders?" She replied, "Yeah, I have trouble reaching over my head. I had surgery on my right shoulder." (R. 86)(emphasis added).

No doctor opined that Plaintiff could not reach at all, and the State agency reviewing physicians opined that Plaintiff had no manipulative limitations. The ALJ did find Plaintiff's tendonitis of the right shoulder to be a severe impairment, however. It follows logically that the left shoulder impairment was also severe, because the MRI showed the same problems bilaterally. Dr. Snead found she had only 90 degrees of abduction on both the right and the left, meaning she could not raise either arm to the sides above shoulder height. He performed surgery only on the right (dominant) shoulder, meaning to the undersigned that the left arm still had only 90 degrees of abduction. The undersigned therefore finds the ALJ should have found Plaintiff's left shoulder impairment to be severe, or at least should have explained why he did not. The evidence clearly shows it was a medically-diagnosed impairment. The ALJ did not discuss Plaintiff's left shoulder impairment at all. Similarly, the ALJ expressly found in his RFC that Plaintiff was unable to use her right upper extremity for work above the shoulder level, so the undersigned is left to speculate as to whether she should have been limited to jobs that did not require her to use either arm for work above the shoulder level.

The undersigned finds substantial evidence does not support the ALJ's omission of Plaintiff's left shoulder impairment as a severe or at least a medically-determinable impairment. The undersigned therefore also finds substantial evidence does not support his RFC or hypothetical to

the VE which both omitted the limitation on work above shoulder level with either arm.

Plaintiff also argues that she cannot perform any of the jobs identified by the VE because they all require more than occasional reaching, grasping, and fingering. The undersigned has already found substantial evidence supports the ALJ's omission of limitation on grasping and fingering. The undersigned also finds substantial evidence, including Plaintiff's own testimony and daily activities, supports a conclusion that Plaintiff can reach in any direction except possibly above the shoulder. The ALJ himself limited Plaintiff to jobs not requiring working with the right arm above shoulder-level.

The U.S. Department of Labor's Dictionary of Occupational Titles (4th ed., Rev. 1991) ("DOT") defines "Reaching" as: "Extending hand(s) and arm(s) in any direction." This clearly includes working above shoulder level. All the jobs identified by the VE require at least frequent "reaching." One may argue that the particular jobs would not require reaching above the shoulder level, as the VE was expressly asked to omit that requirement as regards the right arm. He was not asked whether the jobs would be available to an individual who could use neither arm to work overhead, however.

Further, there appears to be an inconsistency between the jobs the ALJ identified and the DOT. The ALJ asked the VE at the very start of his testimony: "If your testimony conflicts with the dictionary of occupational titles, would you let us know and provide the basis for your opinion?" to which the VE responded: "Yes." The ALJ states in his Decision that the VE's testimony was consistent with information contained in the DOT.

The undersigned, however, finds there is a discrepancy between the VE's testimony and the DOT, as the hypothetical contained a restriction on any work above shoulder level with the dominant

45

hand, and the DOT provides for at least frequent "reaching" ("extending hand(s) and arm(s) in any direction") in every job identified.

Social Security Ruling ("SSR") 00-4p clarifies 20 C.F.R. section 404.1566, which states, without more, that ALJ's will consider both the Dictionary of Occupational Titles and vocational expert testimony to determine whether a Social Security claimant can find work suited to his residual functional capacity. Noting that the sources should typically be consistent, Ruling 00-4p nonetheless provides:

> When there is an apparent unresolved conflict between [VE] evidence and the DOT the adjudicator must elicit a reasonable explanation for the conflict before relying on the [VE] evidence to support a determination or decision about whether the claimant is disabled. At the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency.

Further:

> When a VE or VS provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any possible conflict between that VE or VS evidence and information provided in the DOT. In these situations, the adjudicator will:
>
> Ask the VE or VS if the evidence he or she has provided conflicts with information provided in the DOT; and
>
> If the VE's or VS's evidence appears to be in conflict with the DOT, the adjudicator will obtain a reasonable explanation for the apparent conflict.

Finally:

> When vocational evidence provided by a VE or VS is not consistent with information in the DOT, the adjudicator must resolve this conflict before relying on the VE or VS evidence to support a determination or decision that the individual is or is not disabled. The adjudicator will explain in the determination or decision how he or she resolved the conflict. The adjudicator must explain the resolution of the conflict irrespective of how the conflict was identified.

SSR 00-4p, 2000 WL 1898704 at *2 (December 4, 2000).

The ALJ limited Plaintiff to jobs that did not require work above the shoulder level with the right arm. Every job identified by the VE requires at least frequent reaching, which is defined as "extending hand(s) and arm(s) in any direction."

Defendant may argue that <u>Byrd v. Apfel</u> supports a contention that because the job descriptions do not state that <u>overhead</u> reaching is required, only "reaching," the "reaching does not necessarily conflict with Byrd's restriction from overhead reaching." <u>Byrd v. Apfel</u>, 168 F.3d 481 (4th Cir. 1998)(unpublished). In that case, however, the court expressly noted that the VE was asked and actually testified that overhead reaching was usually not required in the jobs at issue. No such testimony was elicited from the VE in this case. Further, <u>Byrd</u> was decided prior to the effective date of SSR 00-4p.

Considering both the ALJ's lack of explanation for the omission of Plaintiff's left arm impairment together with the inconsistency between the jobs named by the VE and the descriptions of those jobs in the DOT, the undersigned finds substantial evidence does not support the ALJ's determination that there were jobs that existed in significant numbers in the national economy that Plaintiff could have performed.

### E. Credibility

Plaintiff next argues the ALJ's credibility analysis is faulty when he utilized an incorrect pain standard in finding that the plaintiff's subjective symptoms and limitations were not credible and failed to conduct an adequate analysis of the Step Two Credibility determination.

The Fourth Circuit has held that "[b]ecause he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions

are to be given great weight." <u>Shively v. Heckler</u>, 739 F.2d 987, 989 (4th Cir.1984) (citing <u>Tyler v. Weinberger</u>, 409 F.Supp. 776 (E.D.Va.1976)).

The Fourth Circuit has developed a two-step process for determination of whether a person is disabled by pain or other symptoms as announced in <u>Craig v. Chater</u>, 76 F. 3d 585 (4th Cir. 1996):

> 1) For pain to be found to be disabling, there must be shown a medically determinable impairment which could reasonably be expected to cause not just pain, or some pain, or pain of some kind or severity, but *the pain the claimant alleges she suffers*. The regulation thus requires at the threshold a showing by objective evidence of the existence of a medical impairment "which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Cf. Jenkins*, 906 F.2d at 108 (explaining that 42 U.S.C. § 423(d)(5)(A) requires "objective medical evidence of some condition that could reasonably be expected to produce the pain alleged"). *Foster*, 780 F.2d at 1129 . . . .
>
> 2) It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, *that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated*, See 20 C.F.R. §§ 416.929(c)(1) & 404.1529(c)(1). Under the regulations, this evaluation must take into account not only the claimant's statements about her pain, but also "all the available evidence," including the claimant's medical history, medical signs, and laboratory findings, *see id.;* any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.). *See* 20 C.F.R. §§ 416.929(c)(2) & 404.1529(c)(2); and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it. *See* 20 C.F.R. § 416.929(c)(3) & 404.1529(c)(3). (Emphasis added).

<u>Craig</u>, <u>supra</u> at 594.

Here the ALJ found Plaintiff met the first, threshold, step of the evaluation. He was therefore required to proceed to the second step and evaluate the intensity and persistence of her pain and the extent to which it affected her ability to work at the time on or before her Date Last Insured. A review of the decision shows that the ALJ did take into account Plaintiff's statements about her pain, her medical history, medical signs, and laboratory findings and objective medical evidence of pain.

48

He also took into account the medical treatment Plaintiff underwent to alleviate her pain.

The ALJ noted Plaintiff's daily activities, which included taking care of her own personal needs, straightening the house in the morning, fixing dinner, working on the house in the afternoon, reading, watching television and playing games. She stated she was able to make the bed, run the vacuum, wash dishes, cook, clean the bathroom, put groceries away, wash windows, iron clothing, mop the floor, go grocery shopping, and drive a car.

Additionally, it is noted that psychologist Haggerty found Plaintiff's results on the Minnesota Multiphasic Personality Inventory (MMPI-2), a self-report personality test, to "very likely be invalid"(R. 461). Psychologist Joseph considered the results of the same test, given on a later date, valid; however, she noted the profile "should be interpreted with caution," stating: "There is some possibility that the clinical report is an exaggerated picture of the present situation and problems." These opinions regarding invalid results and/or exaggeration of symptoms on a self-report test, lend weight to the ALJ's credibility determination.

It is important to note that the ALJ did not reject Plaintiff's complaints of pain and limitation. He found she had the severe impairments of degenerative disease of the lumbar spine, including mild osteoporosis; tendinitis of the right shoulder; seizure disorder, unspecified and controlled; major depressive disorder; and anxiety disorder. Her residual functional capacity was strikingly limited. The ALJ limited her to light jobs with the opportunity to change positions briefly after sitting for 30 minutes or standing for 20 to 30 minutes, as needed; inability to use her right arm for work above the shoulder level; inability to climb ladders, ropes or scaffolds, or to crawl; only occasional climbing of ramps or stairs; only occasional balancing, stooping, kneeling, and crouching; avoidance of concentrated exposure to excessive cold, dampness, dust and fumes; with an inability to work

49

around crowds; only occasional interaction with the public of a superficial nature; and inability to perform work requiring sustained immediate memory or fast production rate pace.

The ALJ's observations concerning credibility are to be given great weight. <u>Shively v. Heckler</u>, 739 F.2d 987, 989 (4th Cir.1984). The undersigned finds substantial evidence supports the ALJ's determination that Plaintiff's statements concerning her pain and limitations were not credible for the time period April 1, 2005, through December 31, 2008.

## V. CONCLUSION

Upon consideration of all of the above, the undersigned United States Magistrate Judge finds and concludes that substantial evidence does not support the ALJ's determination that there were a significant number of jobs in the economy which Plaintiff could perform, because he failed to discuss Plaintiff's medically-determinable left shoulder impairment and any functional limitations caused by that impairment, and because he failed to resolve the conflict between the DOT and the VE's testimony regarding overhead reaching.

## VI. RECOMMENDED DECISION

For the reasons above stated, I find that the Commissioner's decision denying the Plaintiff's applications for DIB is not supported by substantial evidence. I therefore **RECOMMEND** Defendant's Motion for Summary Judgment be **DENIED**, and Plaintiff's Motion for Summary Judgment be **GRANTED IN PART** by reversing the Secretary's decision under sentence four of 42 U.S.C. §§ 405(g) and 1383(c)(3), with a remand of the cause to the Secretary for further proceedings consistent and in accord with this Recommendation.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the

Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this _31_ day of _August_, 2012.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE